Dashun Walker                June 11, 2008

Page 78

1  Frankie Brown to be a dangerous person, is that
2  correct?
3    A  Yes.
4    Q  Okay. And what crimes, if any, have you
5  charged Frankie Brown with?
6    A  None.
7    Q  What crimes, if any, has Officer Debois
8  charged Frankie Brown with?
9    MS. PENN: Object. Foundation. Calls for him
10 to speculate.
11   THE WITNESS: I don't know.
12   MR. LOEVY: Q  Are you aware of any crime that
13 any Markham police officer has ever charged
14 Mr. Brown with?
15   A  Yes.
16   Q  And what year was that?
17   A  I don't recall the year offhand.
18   Q  Since you've been a Markham policeman?
19   A  Yes.
20   Q  Okay. And that occurred after you became a
21 Markham policeman, correct?
22   A  Yes.
23   Q  Okay. Tell me all the reasons you believe
24 Frankie Brown to be dangerous.

Page 79

1    MS. PENN: I'm going to object to form of the
2  question.
3    THE WITNESS: Because there was a -- I was
4  informed by one of the individuals that Mr. Brown
5  provided information on that his personal safety had
6  been threatened by Mr. Brown.
7    MR. LOEVY: Q  Okay. What's that person's
8  name?
9    MS. PENN: I'm going to object to the disclosure
10 of that individual's identity.
11   MR. LOEVY: Q  What's the person who told you
12 that Frankie Brown threatened him?
13   A  I'm not going to answer that question at
14 this time because I'm not certain if it's, one, in
15 the best interest of his -- of that individual's
16 safety, and, two, because by law I'm prohibited from
17 disclosing their arrest information.
18   Q  Well, I'm not asking you the arrest
19 information. I'm just asking you, who told you that
20 Frankie Brown was dangerous?
21   MS. PENN: He's already answered. Objection.
22 Asked and answered.
23   MR. LOEVY: No, I don't think he has answered.
24   Q  And if you're refusing to answer, tell me

Page 80

1  you're refusing to answer.
2    A  I refuse to answer.
3    Q  Okay. Was there more than one person that
4  has ever told you that Frankie Brown was dangerous?
5    A  No.
6    Q  Am I correct in saying there was only one
7  person who has ever told you that Frankie Brown was
8  dangerous?
9    A  Yes.
10   Q  And you refuse to identify that person,
11 correct?
12   A  I take that back. Two.
13   Q  Okay. Who's the other person that told you
14 that Frankie Brown was dangerous?
15   A  The confidential source.
16   Q  Now, did the confidential source tell you
17 that Frankie Brown was dangerous before you got the
18 search warrant or after?
19   A  This is after the search warrant.
20   Q  Okay. Before the search warrant, did the
21 confidential source say anything about Frankie Brown
22 being dangerous?
23   A  They advised that they had seen Mr. Brown in
24 possession of a firearm.

Page 81

1    Q  When you say they, who do you mean?
2    A  The confidential source.
3    Q  Okay. And, again, it's a little confusing
4  because you say they, which is usually plural, so
5  that's why I keep going back as to whether it's more
6  than one person.
7    MS. PENN: Well, for the record, I believe he's
8  testified that he's using they because he's not
9  going to testify as to a pronoun, he or she, to
10 disclose the -- to disclose the gender of the
11 confidential source.
12   MR. LOEVY: Q  Is that the reason you're saying
13 they?
14   A  Yes, sir.
15   Q  And you can say he/she. I would understand
16 that as well. But if that's the reason, now I
17 understand it.
18      The confidential informant and another
19 arrestee, who you won't identify, are they the only
20 two people that have told you that Frankie Brown was
21 dangerous?
22   A  Yes.
23   Q  Did the confidential informant who gave you
24 the information that led you to seeking a search

78 to 81)

MERRILL LEGAL SOLUTIONS
TEL: (800) 868-0061



EXHIBIT B

Page 82

1  warrant against Frankie Brown sign a confidential
2  informant agreement?
3    A  Yes.
4    Q  Okay. Did he sign that -- he/she sign that
5  in your presence?
6    A  Yes.
7    Q  And you put it as part of the file, is that
8  correct?
9    A  Part of that individual's file, yes.
10   Q  Okay. Did that person tell you what his/her
11 relationship was with Frankie Brown? I'm not asking
12 you what the relationship was, but did he -- he/she
13 describe the relationship?
14   A  There exists a relationship between them.
15   Q  Did that extend just to buying and selling
16 of narcotics?
17   A  I'm not going to answer that.
18   MS. PENN: Object to the form of the question.
19   MR. LOEVY: Q  What did you do to investigate
20 whether or not that person was being truthful prior
21 to the time that you got the issuance of the search
22 warrant?
23   A  I'm sorry, could you repeat that question?
24   Q  I'll withdraw that question.

Page 83

1       You -- am I correct in saying that you gave
2  the confidential informant some money to go and buy
3  drugs from Frankie Brown, is that right?
4    A  Yes.
5    MS. PENN: I'm going to object. That misstates
6  his testimony. There's facts not in evidence. But
7  go ahead.
8    THE WITNESS: Yes.
9    MR. LOEVY: Q  Did I misstate the facts? You
10 gave that person some money to go in and buy drugs
11 from Frankie Brown, correct?
12   A  Yes.
13   Q  Okay. Did you search that person to see
14 whether or not that person had narcotics or not?
15   A  Yes.
16   Q  Okay. And did you do that searching
17 yourself or was it someone else?
18   A  Myself.
19   Q  Okay. You have female officers in Markham,
20 is that correct?
21   A  Yes, we do.
22   Q  And if it was necessary to search an
23 informant or search anyone, it's practice of the
24 Markham Police Department to have a female officer

Page 84

1  do the searching, correct?
2    MS. PENN: Object to form of the question.
3    MR. LOEVY: Q  Correct?
4    MS. PENN: Foundation.
5    THE WITNESS: It depended on the circumstances.
6    MR. LOEVY: Q  Well, what -- under what
7  circumstances would a male police officer in Markham
8  search a female?
9    A  Just general -- a general search, as long as
10 it doesn't require anything that has to go
11 underneath clothing or anything that requires cavity
12 searches.
13   Q  Describe the search that you made of the
14 informant who went into the Frankie Brown residence.
15 That was twice, right?
16   A  Yes.
17   Q  Did you do the searching both times?
18   A  Yes.
19   Q  Did you search both times in roughly the
20 same fashion?
21   A  Yes.
22   Q  Describe the search.
23   A  A general check of making sure that the
24 pockets are empty.

Page 85

1    Q  How did you do that?
2    A  Had the person pull their pockets, turn them
3  inside out.
4    Q  What else did you do?
5    A  Had the person remove their shoes.
6    Q  And what did you do after that? After the
7  person removed their shoes, what did -- look inside,
8  tip it up?
9    A  Had them turn them upside down, tap them
10 together.
11   Q  What else did you do in the search of the
12 confidential informant?
13   A  Had them take their thumbs, run it around
14 their waistline.
15   Q  What else, if anything, did you do?
16   A  Then had them shake the bottom part of their
17 pants.
18   Q  What else, if anything, did you do?
19   A  Had them take the bottom part of the shirt
20 and shake it out.
21   Q  What else, if anything?
22   A  That was it.
23   Q  Am I correct in saying that was the extent
24 of both searches that you did before the

Page 86

1  confidential informant went into Frankie Brown's
2  house?
3     A  That, and I had them open their mouth. That
4  was it.
5     Q  Okay. What else? Anything else?
6     A  No.
7     Q  The first time that the confidential
8  informant went into Frankie Brown's house where did
9  you meet that person -- well, did you meet the
10 person prior to that?
11    A  Yes.
12    Q  Where were you -- that day where did you
13 meet the person?
14    A  Initially at the Markham Police Department.
15    Q  Where in the Markham Police Department?
16    A  The investigation division.
17    Q  Okay. How did the person get to the
18 investigation division?
19    A  I had them meet me at the station.
20    Q  Well, when did -- how did you go about
21 getting in touch with the person?
22    A  Officer Debois got in contact with the
23 individual for me.
24    Q  Did he have his/her phone number?

Page 87

1     MS. PENN: Object to foundation. It calls for
2  him to speculate.
3     THE WITNESS: I don't know whether or not he has
4  that individual's phone number.
5     MR. LOEVY: Q  Well, when you created a file,
6  if you would have had a phone number, would you have
7  put the phone number in there?
8     A  Yes.
9     Q  Okay. Does that help refresh your
10 recollection as to whether or not you had the phone
11 number or Debois had the phone number of the
12 informant?
13    A  Yes.
14    Q  Okay. Did he have the phone number?
15    MS. PENN: I'm going to object. Same objection,
16 as to foundation.
17    THE WITNESS: I don't know.
18    MR. LOEVY: Q  Did you have the phone number of
19 the informant?
20    A  Yes, I have the informant's phone number.
21    Q  Okay. Did you get that -- when did you
22 first get the informant's phone number?
23    A  I believe that day, when the informant
24 initially came in and met with me.

Page 88

1     Q  Did you give the informant your phone
2  number?
3     A  Yes.
4     Q  Which phone number did you give her? I'm
5  not asking the number. Did you give her to the
6  station, did you give your cell phone number, your
7  home number, what number did you give the informant,
8  he/she?
9     A  My desk line.
10    Q  Did you give the informant any number other
11 than your desk line?
12    A  No.
13    Q  Did the informant ever call you on your desk
14 line?
15    A  No.
16    Q  At no time, correct?
17    A  No.
18    Q  Okay. What time of day was it -- this is
19 now the first time. What time of day was it that
20 you met with the informant?
21    A  Daylight. I can't recall exactly what time.
22    Q  Who was present when you met with the
23 informant?
24    A  Myself and Officer Debois.

Page 89

1     Q  How was the informant dressed?
2     A  I don't recall.
3     Q  Street clothing?
4     A  Yes.
5     Q  What did you say to the informant and what
6  did the informant say to you at the station?
7     A  I don't recall.
8     Q  Do you recall anything you said to the
9  informant or anything the informant said to you?
10    A  Not offhand.
11    Q  Well, take your time and think about it.
12    A  No.
13    Q  Did you make plans for the informant to go
14 into the house?
15    A  Yes.
16    Q  Did you search the informant at the station?
17    A  Yes.
18    Q  Was that the only time you had searched the
19 informant that day?
20    A  No.
21    Q  You searched the informant more than once?
22    A  Yes.
23    Q  Why did you search the informant more than
24 once?

23 (Pages 86 to 89)

Page 90

1    A  The initial search was before the informant
2  went to the residence. The second search was once
3  the informant returned from the residence.
4    Q  Okay. Thank you. Am I correct in saying
5  the only search you performed on the informant
6  before the informant went into the residence was at
7  the station?
8    A  Correct.
9    Q  Was Debois present when you did the search?
10    A  Yes.
11    Q  Anybody else present?
12    A  I don't believe so.
13    Q  What instructions, if any, did you give the
14  informant?
15    A  I told the informant to leave the station
16  walking in a northern direction until they reached
17  Nottingham, to travel eastward on foot down
18  Nottingham to the residence.
19    Q  And you knew where the residence was because
20  you had surveilled it in the past, correct?
21    A  Correct.
22    Q  And at that point in time you had never
23  yourself seen any unlawful activity at that
24  residence, correct?

Page 91

1    A  Correct.
2    Q  And no police officer had ever told you they
3  had ever seen any unlawful activity at that
4  residence, correct?
5    A  Prior to that buy or...
6    Q  Prior to the time the informant walked down
7  the street to Frankie Brown's house.
8    A  Yes.
9    Q  What police officer told you they had seen
10  unlawful activity before that?
11    A  Mr. Brown had been arrested by Deputy Chief
12  Knapp.
13    Q  Okay. And that was for a weapons charge,
14  correct?
15    A  For forgery.
16    Q  For forgery. Other than that incident, had
17  you ever been aware of any unlawful activity that
18  had transpired at Frankie Brown's house?
19    A  Not offhand that I can recall.
20    Q  Well, when you saw -- you -- you were parked
21  out there yourself 15 to 20 times, correct?
22    A  Correct.
23    Q  And you didn't see any unlawful activity
24  during those 15 to 20 times, correct?

Page 92

1    A  No.
2    Q  No, I'm not correct, or, yes, I am correct?
3    A  No, I didn't observe anything.
4    Q  Well, you were at the station, you told the
5  person to walk to the Brown residence, correct?
6    A  Correct.
7    Q  What did you do after you told the person to
8  do that?
9    A  I maintained surveillance, then --
10    Q  How did you maintain surveillance?
11    A  From a distance I watched the person.
12    Q  Well, did you walk yourself or did you get
13  in your car?
14    A  I was in the area. I don't want to say
15  specifically how I was watching the person because I
16  don't want them to reveal it to the other
17  individuals in the area, how I conduct my
18  surveillance.
19    Q  Well, I'm sorry. You told the person to
20  leave the station --
21    A  Correct.
22    Q  -- walk to Frankie Brown's house. Tell me
23  what you did after you told the person to do that.
24    A  At that point I physically watched the

Page 93

1  person exit the door.
2    Q  Yes.
3    A  Watched them proceed to Kedzie Parkway.
4    Q  Yes.
5    A  Watched the person proceed directly down
6  Kedzie Parkway to Nottingham. Once the person got
7  to Nottingham, the person turned and went -- walked
8  east on Nottingham, for which I switched my
9  location.
10    Q  At that point did you leave the station?
11  When did you leave the station? Or did you leave
12  the station?
13    A  Yes.
14    Q  When did you -- where was the person when
15  you left the station, the informant?
16    A  The informant walked out before I did.
17    Q  How much space was between you and the
18  informant?
19    A  When they initially left the station, maybe
20  10 or 15 feet.
21    Q  And did you maintain the distance of 10 or
22  15 feet until you reached Nottingham?
23    A  No.
24    Q  What did you do, in terms of distance,

Page 94

1  before that person reached Nottingham?
2     A   It's an open area, so I just was in the
3  vicinity, on the opposite side of the street,
4  maintaining surveillance.
5     Q   When the person turned into Nottingham,
6  where were you?
7     A   At that point I was also on Nottingham.
8     Q   You got to Nottingham at the same time that
9  the person did?
10    A   Yes.
11    Q   Okay.  Then you weren't following the
12 person, you were just walking across the street at
13 the same pace, is that correct?
14    A   I'm not going to say how I was out there,
15 but I maintained a visual of that subject.
16    Q   Well, I'm asking you how you -- you're just
17 not going to tell me because you don't want to?
18    A   I'm not going to tell you because I don't
19 want to give up how I conduct my surveillance.
20    Q   Well, I think your counsel will tell you
21 that the surveillance of the informant is a -- is an
22 important part of this case.  The fact is, is we're
23 all officers of the Court and we're not going to
24 reveal to criminals how you conduct your

Page 95

1  surveillance.
2         But I want to know whether that person was
3  within your vision or not within your vision --
4     MS. PENN:  Can I have a moment to speak with my
5  client?
6     MR. LOEVY:  Sure.
7     VIDEOGRAPHER:  We are going off the record at
8  1:50.
9         (a brief recess was taken)
10    VIDEOGRAPHER:  We are going back on the record
11 at 1:56.
12    MR. LOEVY:  Q  Before we went off the record, I
13 was asking you where you were relative to the
14 confidential informant after he/she left the police
15 station, but prior to the time that he/she got to
16 Frankie Brown's house.
17        Do you recall my asking you some questions?
18    A   Yes.
19    Q   Did you leave the police station after the
20 informant left the police station?
21    A   No.
22    Q   Did you leave the police station when the
23 informant left the station?
24    A   I actually entered the parking lot before

Page 96

1  the subject exited the door.
2     Q   The parking lot of the Markham Police
3  Department, is that right?
4     A   Correct.
5     Q   And did you then observe the informant exit?
6     A   Yes.
7     Q   What happened then?
8     A   At that point the subject began walking.
9  They made it to the sidewalk, got to the sidewalk
10 and began walking northerly, in a northward fashion,
11 towards Nottingham.
12    Q   What did you do when that was going on?
13    A   I repositioned my vehicle to the opposite
14 side of the street where I maintained a visual.
15    Q   Okay.  Am I correct in saying that you had
16 had -- well, strike that.
17        When did you enter your vehicle, before she
18 left the station or after she left the station?
19    A   As the person was coming out the door.
20    Q   Okay.  That's when you got into your
21 vehicle, right?
22    A   Correct.
23    Q   And then as she walked, did you follow her
24 in your vehicle?

Page 97

1     A   I maintained -- I was stationary, but I
2  maintained a visual of that person.
3     Q   Through the windshield of your car?
4     A   Looking through the window, yes.
5     Q   Okay.  Then that person turned on
6  Nottingham, right?
7     A   At the point when the person made it to
8  Nottingham, I was ahead of them.
9     Q   So you went ahead of the person, correct,
10 and then turned on Nottingham before they reached
11 Nottingham?
12    A   No.  I was -- the position that I was at
13 with my vehicle, I was able to see the person coming
14 up the sidewalk, and as they made it to Nottingham,
15 I was out of my car.
16    Q   There was a point you parked your car?
17    A   The vehicle was basically stationary up
18 until the individual made it to the halfway mark.
19    Q   You passed the person, you parked your
20 vehicle, then were you looking at that person in
21 your rearview mirror, if you were ahead of the
22 person, or did you turn around to look at the
23 person?
24    A   No, I didn't pass him.

Page 98

1   MS. PENN: I'm going to object. That misstates
2   his testimony.
3   THE WITNESS: I didn't pass him.
4   MR. LOEVY: Q   You never passed the person?
5   A   No.
6   Q   You always stayed behind the person?
7   A   Correct.
8   Q   When the person reached Nottingham, they
9   were ahead of you then?
10   A   No -- well, a couple of feet, but I was on
11   the opposite side of the street. So as the
12   individual turned -- turned to go down Nottingham, I
13   was already standing. I had got out of the car and
14   I was standing.
15   Q   Where was the person when you got out of the
16   car?
17   A   On the opposite side of the street.
18   Q   Which street?
19   A   Kedzie. They were on Kedzie Parkway. I'm
20   on Kedzie Boulevard.
21   Q   Okay. After the person turned on
22   Nottingham, how far did they have to go to the
23   Frankie Brown house?
24   A   Half a block.

Page 99

1   Q   Did you watch that person walk that half a
2   block?
3   A   Yes.
4   Q   Where were you when that person walked the
5   half a block to the Brown house?
6   A   I was on the opposite side of the street
7   walking.
8   Q   On Nottingham, correct?
9   A   Correct.
10   Q   And when you -- did the person get to
11   Nottingham -- did the person get to Frankie Brown's
12   house before you did?
13   A   I never went to Mr. Brown's house.
14   Q   You were on the other side of the -- before
15   you were equal distance on the other side of the
16   street?
17   A   I was like staggered behind the individual,
18   but I was able to see -- maintain a complete visual
19   at all times.
20   Q   You observed the person go into the house,
21   right?
22   A   Yes.
23   Q   Okay. And were you hiding or not when you
24   observed that?

Page 100

1   A   Actually, I was still on the sidewalk.
2   Q   Plain view?
3   A   Yes.
4   Q   Okay. How were you dressed, civilian
5   clothes?
6   A   Yes.
7   Q   Jeans?
8   A   I believe so.
9   Q   And did you stand on the sidewalk for the
10   entire time that the person was inside Brown's
11   house?
12   A   No.
13   Q   What did you do?
14   A   I actually stood off in the driveway of
15   another residence.
16   Q   Okay. A residence across the street,
17   correct?
18   A   Correct.
19   Q   And how long was that person in Brown's
20   residence?
21   A   The first time --
22   Q   That's all we're talking about.
23   A   -- was -- I don't even think he was in there
24   a good five minutes.

Page 101

1   Q   How did the person gain entry, knock on the
2   door or ring a doorbell, what did you see?
3   A   She rang the doorbell.
4   Q   Okay. And how long was it before someone
5   responded?
6   A   A dark complected, male subject came to the
7   door, let the informant in, closed the door.
8   Q   Was that person that you now know to be
9   Frankie Brown or someone else?
10   A   At that particular time I couldn't
11   physically identify who that dark-skinned person
12   was.
13   Q   Do you believe that person to have been
14   Frankie Brown now?
15   A   I do now.
16   Q   As you sit here now, you think it was
17   Frankie Brown who let that person in, correct?
18   A   Yes.
19   Q   Okay. And then after five minutes, roughly,
20   what happened then?
21   A   The informant exited the front door, walked
22   back towards Kedzie Parkway, went back, but instead
23   of going south on Kedzie, crossed over and went down
24   another street that I had informed the person to go

Page 102

1  down.
2  Q  Well, the person didn't go directly back to
3  the station?
4  A  No. That wasn't our meeting point.
5  Q  Where was your meeting point?
6  A  Our meeting point was on 160 -- like 160 --
7  162nd and Sawyer.
8  Q  How far was that from the Brown residence?
9  A  It was probably like two blocks away, but
10 out of the sight of anybody on Nottingham.
11 Q  I see. And what record, if any, did you
12 create concerning that informant's first visit to
13 the Brown house?
14 A  Just the inventory.
15 Q  Anything other than the inventory?
16 A  No. I don't think I did a -- a supplement
17 on that.
18 MS. PENN: Just so I'm clear, other than what's
19 contained in the search warrant complaint?
20 MR. LOEVY: No. This is well before the
21 search -- well, not well before. It's before the
22 search warrant complaint.
23 Q  What documents, if any, did you create?
24 A  The inventory document for what was

Page 103

1  recovered from the informant.
2  Q  Was that the only document that you created
3  at that time?
4  A  Yes.
5  Q  You didn't create a police report saying I
6  talked to person X, I spent the last X number of
7  minutes observing him enter a home?
8  A  No.
9  Q  Nothing about -- no document confirming that
10 they had bought narcotics other than the inventory?
11 A  Well, the initial part of the search
12 warrant.
13 Q  Well, you didn't create --
14 A  The search warrant complaint.
15 Q  Well, how many days after this was it that
16 you created the search warrant complaint?
17 A  Well, I had actually started --
18 Q  Oh.
19 A  -- started it then.
20 Q  Right that day?
21 A  Yeah.
22 Q  Oh. Let's -- let's find out about that.
23 A  There it is right there.
24 Q  Right on top.

Page 104

1  MR. LOEVY: Would you mark this as Exhibit 1,
2  please?
3  (Walker Exhibit Number 1 marked as requested)
4  MR. LOEVY: Q  Now, after the first time that
5  the informant entered the Brown residence, what
6  portion, if any, of this complaint for a search
7  warrant did you complete?
8  A  The first page and then the first paragraph.
9  Q  Of the second page?
10 A  Correct. The first paragraph and then the
11 part -- the second -- actually, the first and second
12 paragraph.
13 Q  Okay. Am I correct in saying that the first
14 time that the person went into the Brown residence
15 and then left, you created the first page of
16 Exhibit 4 --
17 A  Correct.
18 Q  -- Exhibit 1?
19 A  Correct.
20 Q  And the first two paragraphs of two?
21 A  Correct.
22 Q  Okay. So at that time you knew that --
23 well, strike that, please.
24    How did you learn that Frankie Brown was

Page 105

1  approximately 47 years of age; five, nine; and 165
2  pounds at the time you created that?
3  A  Because I ran his background. That's the
4  very first step.
5  Q  You were the affiant or the affiant,
6  correct?
7  A  Correct.
8  Q  Okay. And so you swore that this
9  confidential source had been known to you for a
10 period of one year, is that correct?
11 A  Correct.
12 Q  And based on your earlier testimony, you had
13 known who this person was for a year, not just what
14 Debois had told you, but you had known about this
15 person for a year, right?
16 A  Correct.
17 Q  And tell me when you first knew about this
18 confidential source.
19 A  I didn't -- my first knowledge of the person
20 was just as a citizen because the person is a
21 resident of Markham, but I didn't learn of him being
22 an informant until...
23 Q  Until Debois had told you?
24 A  Correct.

### Page 106

1  Q  How did you learn that the confidential
2  source was familiar with the look, feel and effect
3  of cocaine?
4  A  Because that's what the person advised me
5  of.
6  Q  Okay. Was that your sole source of that
7  information?
8  A  Yes.
9  Q  And you also indicated in your complaint for
10 a search warrant that during the past six months you
11 had been conducting a narcotic investigation
12 concerning Frankie Brown.
13 A  Correct.
14 Q  And why didn't you indicate that your
15 narcotics investigation had not revealed any
16 unlawful activity in your application for a search
17 warrant?
18    MS. PENN: Object to form and foundation, form
19 of the question, improper hypothetical.
20    THE WITNESS: That wasn't relevant.
21    MR. LOEVY: Q  You didn't think that was
22 relevant?
23 A  That wasn't relevant for the search warrant.
24 Q  Okay. Let me -- let me change the topic

### Page 107

1  just a little bit and then we'll come back to this.
2  Okay?
3  A  Okay.
4  Q  Do you have any friends who are homosexuals?
5    MS. PENN: I'm going to object --
6    THE WITNESS: Yes.
7    MS. PENN: -- as to the form of the question.
8  Relevance.
9    MR. LOEVY: Q  Tell me the names of your
10 friends who are homosexuals.
11   MS. PENN: Object to relevance.
12   MR. LOEVY: Well, you've read the complaint. I
13 mean, I think you know what the relevance is.
14   MS. PENN: As to the names of his friends that
15 are homosexuals?
16   MR. LOEVY: Sure.
17   MS. PENN: What is the relevance of that?
18   THE WITNESS: I don't think they want me giving
19 out their names about their -- their sexual
20 preference.
21   MR. LOEVY: Q  Why wouldn't they want you to
22 reveal their names concerning their sexual
23 preference?
24   MS. PENN: Objection. Form. Calls for him to

### Page 108

1  speculate.
2    MR. LOEVY: I don't want this deponent at trial
3  to testify he's got a lot of friends that are
4  homosexuals and, therefore, couldn't have been
5  engaged in the activity that he was accused of. In
6  fact, we've had police officers who have testified
7  to exactly that. So I think it's perfectly relevant
8  to ask, and I am asking.
9  Q  How many friends you have that are
10 homosexuals?
11 A  I know of several.
12 Q  Are they your friends?
13 A  Associates.
14 Q  Do you have any friends, not just
15 associates, but friends that are homosexuals?
16 A  Well, I constitute everybody as an
17 associate.
18 Q  Frankie Brown your associate?
19 A  No.
20 Q  Okay. What do you mean when you say
21 everybody is your associate?
22 A  Unless we're blood relatives, we are
23 associates.
24 Q  Tell me the names of anyone that you know

### Page 109

1  and interact with that is an open homosexual.
2    MS. PENN: I'm going to object as to the
3  relevance of disclosing names of individuals that is
4  a known homosexual.
5    MR. LOEVY: Openly homosexual.
6    MS. PENN: Do you know what he means by openly
7  homosexual?
8    THE WITNESS: They are open, but I don't think
9  that they would appreciate me putting them -- saying
10 that out here for this case, this --
11   MR. LOEVY: Q  Frankie Brown didn't appreciate
12 what happened to him either.
13   MS. PENN: I'm going to object to that.
14   MR. LOEVY: Q  And that's why whether or not
15 they appreciate it or they don't appreciate it, I
16 want to know, if you're willing to tell me, the
17 names of anyone that you associate with or that you
18 consider a friend who is an open -- and by open I
19 mean a declared homosexual.
20 A  When I speak to that person -- well, to
21 those individuals, if they tell me that it is okay
22 for me to release their names, I don't have no
23 problem doing that. But prior to that, not without
24 their consent. I will not divulge that information.